Filed 9/28/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN DAVEILO DUKE,<br><br>    Defendant and Appellant. | B300430<br><br>(Los Angeles County<br>Super. Ct. No. MA057733) |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa M. Chung, Judge.  Affirmed.

Spolin Law, Aaron Spolin and Caitlin Dukes for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Nancy Lii Ladner, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Defendant and appellant Jonathan Daveilo Duke challenges the trial court's denial of his petition under Penal Code[1] section 1170.95 for resentencing on his murder conviction. A jury convicted Duke of murder in 2013 for his involvement in an incident in which a cohort stabbed the victim, Victor Enriquez, to death. The trial court denied the petition after finding beyond a reasonable doubt that Duke could still be convicted of murder and was thus ineligible for resentencing under section 1170.95. Duke contends that the trial court erred by treating the case as if it involved felony murder, when it instead involves the application of the natural and probable consequences doctrine. We agree that the case does not involve felony murder, but we nevertheless affirm because the court correctly concluded that Duke could still be convicted of murder under the law as amended.

## FACTS AND PROCEEDINGS BELOW

In a prior opinion in Duke's direct appeal (*People v. Duke* (Jan. 17, 2017, B264579) [nonpub. opn.] (*Duke I*)), we described the facts of the case as follows:

"Evidence indicated that virtually all those involved in the case—the victim, the perpetrators, and the most important witnesses—were members of, or associated with, various street gangs. According to a [Los Angeles County] [S]heriff's deputy who testified as an expert witness, members of many different gangs reside in close proximity to one another in Palmdale. Gang members typically arrive in Palmdale when their families relocate from other areas of Los Angeles County. Because most gang members are transplants from other areas, gangs in

---

[1] Subsequent statutory references are to the Penal Code.

Palmdale generally have less clearly defined territories than elsewhere.

"Enriquez, the victim in this case, and Duke were both members of the Rollin' 60's, a gang associated with the Crips. Crowder, Duke's codefendant who played the lead role in the stabbing, was a member of the Fruit Town Piru gang, which is associated with the Blood Nation. Terrence Dorsey, Enriquez's friend who testified against Duke, was affiliated with the Kitchen Crips gang but he testified that he had not been active in the gang for many years. Three other key witnesses, Anthony Palmer, Deon Tatum, and Kenneth Thomas, were all members of Dime Block, a small gang that started in the area near where the murder took place. In other areas of Los Angeles County, members of these different gangs might be enemies, but because of the lack of well-defined gang territories in Palmdale, members of the gangs in the Palmdale area often associate with and ally with one another.

"Palmer testified that, although they were both members of the same gang, Duke and Enriquez had disliked one another since at least June 2012, when they got into a fistfight after Enriquez told people that Duke was not a true member of the Rollin' 60's because he had not been jumped into the gang.

"According to Palmer, in the months prior to the [stabbing], rumors spread among gang members in the area that Enriquez was a snitch, and that when police had discovered a gun that might have belonged to him, he blamed his own brother, another member of the Rollin' 60's. Palmer heard that Enriquez might have provided the police with information that led to Palmer's conviction for felony theft. Detective Richard O'Neal, a sheriff's deputy assigned to the gang detail, confirmed these

rumors, testifying that Enriquez had been a police informant for a couple of months, and that his information led to the arrest of a drug dealer named Kevin Hart on the same day that Enriquez was later murdered.

"The prosecution presented four accounts from witnesses who either testified or told police that they witnessed the stabbing or the events immediately before and afterward. Two of these witnesses, Palmer and Dorsey, testified at trial. The other two, Tatum and Thomas, testified that they did not know or could not remember anything about the murder, but the court admitted their prior statements made to the police in which they described what happened immediately before and after the stabbing.

"Palmer testified that, on the night of the stabbing, Duke, Crowder, and several other gang members congregated outside Duke's home, which was located across the street from the apartment complex where Enriquez was located. Upon seeing Enriquez inside the gate of the apartment complex, the group talked about retaliating against him for his snitching. Crowder and Duke said they 'got to do something to' Enriquez. Duke encouraged Palmer to shoot Enriquez in retaliation for Enriquez's role in securing Palmer's conviction for felony theft. According to Palmer, Duke offered to obtain a gun for Palmer to use, but Palmer said they should wait until later, when fewer people were around.

"Palmer left the group but returned approximately 30 minutes later. When he returned, he saw Duke and Crowder walking across the street toward the security gate of the apartment complex where Enriquez and Dorsey were located. He saw Crowder punch Enriquez, and Duke joined in, hitting Enriquez once or twice. Enriquez tried to run away, but Crowder

4

pursued Enriquez and fell on top of him.  At this point, Palmer saw that Crowder had a knife in his hand.  Duke did not help Crowder chase down Enriquez, but stayed at the gate. Afterward, Duke and Crowder walked back across the street, and Palmer and the others ran away.

"Tatum, another member of the Dime Block gang and an associate of Palmer, testified that he did not see the stabbing and said he could remember nothing in relation to it.  The prosecution played a recording of Tatum's police interview made shortly after Enriquez was killed in which Tatum described events shortly before and after the stabbing consistent in most respects with Palmer's testimony and adding details of events that occurred when Palmer was not present.  Tatum told police that while the group was congregated outside Duke's house, he saw Duke and Crowder get 'big ass knives' and start jumping around and displaying them.  According to Tatum, Crowder's knife looked like 'brass knuckles,' while Duke's was a large kitchen knife. Tatum saw the two holding the knives as they walked across the street toward the gate to the apartment complex where Enriquez was located.  Tatum then left the scene, explaining that he did not believe anything would happen and that he did not want to witness a stabbing.  Tatum identified Duke and Crowder from a photo array as the people he saw holding the knives.

"Dorsey was a member of the same gang as Duke and Enriquez, the Rollin' 60's, a gang affiliated with the Crips. Dorsey testified that he and Enriquez spent the evening in an outdoor area of the apartment complex smoking marijuana.  He saw Duke and Crowder approaching the security gate together. Enriquez asked Duke and Crowder if they wanted to enter, and held the door open for them.  According to Dorsey, Crowder

5

pulled Enriquez toward him and stabbed him. Dorsey then ran away.

"Kenneth Thomas, a member of a local unaffiliated gang, and one of the group that gathered near Enriquez's building, testified that he had never seen Duke before, and that the police were trying to get him to lie about witnessing the stabbing. Detective Brandt House, a deputy [sheriff], testified that he interviewed Thomas a few days after the stabbing, and that on that occasion, Thomas told him that he saw the stabbing. According to Detective House, Thomas told him that he saw Enriquez on the ground with two men standing over him. One of the men was bent over and appeared to be striking Enriquez with a knife. Thomas said that the other attacker was 'posted up,' standing at the ready to assist the primary attacker. Thomas told Detective House that he believed the second attacker also had a knife, and that he had struck Enriquez. Thomas also remembered Dorsey being present with Enriquez, but said that Dorsey was not one of the attackers. The primary attacker then got into a car. Thomas refused to identify the attackers from a photographic line-up.

"A prosecution medical expert who performed an autopsy on Enriquez testified that Enriquez had been stabbed 15 times, and that more than half of the stab wounds could have been fatal.

"Deputies arrested Crowder two days later, on October 19. They discovered Crowder had a cut and a scrape on his right knee, which was consistent with an injury he might have suffered when, according to Palmer's testimony, Crowder tripped and fell over Enriquez during the attack. Deputies searched Crowder's home and found a shoe with dried blood on it. Lab tests revealed the blood contained DNA from Enriquez, as well as from an

unknown person, but not from Crowder or Duke. Acting on information from an anonymous caller, deputies discovered two knives in an abandoned mattress near the stabbing location. One of the knives had finger holes and appeared to have blood on it. Lab tests showed that the blood contained Enriquez's DNA and DNA from an unknown party. The other knife was a serrated kitchen knife that did not appear to have blood on it. According to the prosecution's medical expert, the knife with finger holes could have caused all of Enriquez's wounds, and the kitchen knife would not have caused wounds like those Enriquez suffered." (*Duke I*, *supra*, B264579.)

A jury convicted Duke of first degree murder (§ 187) and found true an allegation that Duke committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)). The trial court sentenced Duke to 25 years to life in prison. In a prior opinion (*Duke I*, *supra*, B264579), we conditionally reversed the conviction because we could not rule out the possibility that the jury relied on the natural and probable consequences doctrine to convict Duke, and in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), decided after Duke's trial, our Supreme Court held that the natural and probable consequences doctrine cannot support a conviction for first degree murder. Under *Chiu*, the natural and probable consequences doctrine could still support a conviction for second degree murder. (*Id.* at p. 166.) Consequently, we offered the prosecution the option either to accept a reduction in Duke's sentence to second degree murder, or to retry him for first degree murder. The prosecution chose the former option, and the trial court sentenced Duke to 15 years to life in prison. Duke filed a new appeal to challenge the court's calculation of his credit for time served. The trial court corrected the calculation, and we

7

affirmed.  (*People v. Duke* (May 1, 2018, B283598) [nonpub. opn.] (*Duke II*).)

In 2018, after Duke's second appeal, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437), which abolished the natural and probable consequences doctrine in cases of murder, and limited the application of the felony murder doctrine.  The legislation also enacted section 1170.95, which established a procedure for vacating murder convictions for defendants who could no longer be convicted of murder because of the changes in the law and resentencing those who were so convicted.  (Stats. 2018, ch. 1015, § 4, pp. 6675–6677.)

Duke filed a petition for resentencing on January 2, 2019. The trial court appointed counsel to represent Duke, obtained briefing from both sides, and found that Duke had made a prima facie case that he was entitled to relief.  After a final eligibility hearing (see § 1170.95, subd. (d)(3)), the trial court denied the petition.

## DISCUSSION

Duke contends that the trial court erred by analyzing his case as if he had been convicted on a felony-murder theory, when that was not the case, and that the court therefore erred by denying his petition.  We agree with Duke that the court incorrectly considered the case as if it involved felony murder, but we nevertheless affirm because the court's finding regarding Duke's involvement in the murder was both supported by the evidence and sufficient to justify denying his petition.

## A. *Background on Senate Bill No. 1437*

The natural and probable consequences doctrine provides that " '[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. . . .' [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 920.)  The doctrine "imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. . . .' [Citation.]" (*Chiu, supra*, 59 Cal.4th at p. 164).  Prior to the enactment of Senate Bill No. 1437, an aider and abettor to a crime that resulted in a death could be convicted of murder even if he did not intend or participate in the killing.  Senate Bill No. 1437 amended section 188 to provide that, in order to be guilty of murder, a principal must "act with malice aforethought," and that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (Stats. 2018, ch. 1015, § 2, p. 6675; *In re R.G.* (2019) 35 Cal.App.5th 141, 144.)  In this way, the law eliminated the natural and probable consequences doctrine in cases of murder. (*People v. Verdugo* (2020) 44 Cal.App.5th 320, 323, review granted Mar. 18, 2020, S260493 (*Verdugo*); *People v. Lewis* (2020) 43 Cal.App.5th 1128, 1134, review granted Mar. 18, 2020, S260598 (*Lewis*).)

The sole exception to the malice requirement is in cases of felony murder.  (See § 188, subd. (a)(3).)  In such cases, the law added a new requirement that a participant in an enumerated felony "in which a death occurs is liable for murder only if one of the following is proven:  [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the

intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(1)–(3).)

Senate Bill No. 1437 also enacted section 1170.95 to allow previously convicted defendants an opportunity to petition for resentencing. The statute requires a defendant to submit a petition affirming that he meets three criteria of eligibility: (1) He was charged with murder in a manner "that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine" (§ 1170.95, subd. (a)(1)); (2) He "was convicted of" or pleaded guilty to "first degree or second degree murder" (§ 1170.95, subd. (a)(2)); and (3) He "could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective" as a part of Senate Bill No. 1437 (§ 1170.95, subd. (a)(3)).

Upon receipt of a facially sufficient petition, the trial court reviews it to determine whether the petitioner has made a prima facie case for relief. (§ 1170.95, subd. (c).) If the petitioner meets this requirement, the court issues an order to show cause and holds a hearing to determine whether to vacate the murder conviction. (§ 1170.95, subd. (d)(1).) At this final stage of the proceeding, the prosecution bears the burden of proving "beyond a reasonable doubt[ ] that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).)

10

## B. *The Trial Court Erred by Analyzing This Case Under the Requirements for Felony Murder, but the Error Was Harmless*

In this case, the only felony count alleged against Duke was murder, and we have seen nothing in the record to indicate that the prosecution ever alleged that Duke was guilty of felony murder. Instead, as we explained in *Duke I*, the prosecution argued that Duke was guilty of murder under two theories: direct aiding and abetting, and as a natural and probable consequence of his participation in assaulting Enriquez. (*Duke I*, *supra*, B264579.) The trial court instructed the jury on both theories, and we could not determine with certainty which theory the jury relied on when finding Duke guilty. (*Ibid.*)

In adjudicating Duke's section 1170.95 petition, the trial court nevertheless treated the case as if Duke had been convicted of felony murder, and attempted to determine whether Duke fell within one of the three categories of felony-murder liability under the newly amended section 189, subdivision (e).[2] The court found

---

[2] The trial court found that Senate Bill No. 1437 did not eliminate the natural and probable consequences doctrine in cases of murder. As a result, the court did not consider the issue of whether Duke was guilty as a direct aider and abettor or whether he was guilty only under the natural and probable consequences doctrine. In reaching the conclusion that the natural and probable consequences doctrine remained a viable basis for a murder conviction, the trial court relied on the Fourth Appellate District opinion in *People v. Gentile,* which was published at the time but subsequently ordered not published when the Supreme Court granted review. (See *People v. Gentile* (May 30, 2019, E069088), review granted and opn. ordered nonpub. Sept. 11, 2019, S256698; argument limited to specified

that Duke was not the actual killer (see § 189, subd. (e)(1)), but the court found "beyond a reasonable doubt that there was sufficient evidence presented to show" that Duke met the two remaining requirements for felony-murder liability under the new law. Thus, the court found that Duke, acting "with intent to kill, aided or abetted or assisted the actual killer in the commission of the offense," and that "he was a major participant in the underlying felony and acted with reckless indifference to human life."

The court erred by treating the case as one involving felony murder rather than the application of the natural and probable consequences doctrine, but this error did not prejudice Duke. In finding that there was sufficient evidence to show that Duke acted with the intent to kill, the court found that Duke acted with express malice. (See § 188, subd. (a)(1); accord, *People v. Beltran* (2013) 56 Cal.4th 935, 941–942.) He therefore could still be convicted of murder under the current section 188.

Duke argues that the trial court's decision is inconsistent with our prior opinion in *Duke I*, in which we

issues, Supreme Ct. Minutes, Oct. 30, 2019, p. 1546; pending argument and decision.) Every published case that has considered the issue has concluded, as we have above, that Senate Bill No. 1437 did indeed eliminate the natural and probable consequences doctrine issue in cases of murder. (See, e.g., *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1102–1103, review granted Nov. 13, 2019, S258175; *Verdugo*, *supra*, 44 Cal.App.5th at p. 323, review granted Mar. 18, 2020, S260493; *Lewis*, *supra*, 43 Cal.App.5th at p. 1134, review granted Mar. 18, 2020, S260598.) As we explain, however, the court's error was harmless.

stated that "the evidence did not unequivocally show that Duke intended for Enriquez to die." (*Duke I, supra,* B264579.) This misunderstands the difference in the standard of review between *Duke I* and this case. In *Duke I*, after we held that the trial court erred by instructing the jury on the natural and probable consequences as a basis for first degree murder, we had to determine whether the error was prejudicial. We were required to reverse Duke's conviction "unless we conclude[d] *beyond a reasonable doubt* that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Chiu, supra,* 59 Cal.4th at p. 167, italics added.) By holding that the error was not harmless under this exacting standard, we held only that a rational jury *could* have convicted Duke on the basis of the natural and probable consequences doctrine. Our holding on this point does not suggest what theory the jury actually relied on, nor whether there was sufficient evidence to support any other theory.

In deciding a petition at the final stage of review under section 1170.95, the trial court applies a very different standard. The prosecution bears the burden "to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) The primary requirement[3] for eligibility

---

[3] Section 1170.95, subdivision (a) contains two other eligibility criteria: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree

for resentencing under section 1170.95 is that "[t]he petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(3).)  To carry its burden, the prosecution must therefore prove beyond a reasonable doubt that the defendant *could* still have been convicted of murder under the new law—in other words, that a reasonable jury could find the defendant guilty of murder with the requisite mental state for that degree of murder.  This is essentially identical to the standard of substantial evidence, in which the reviewing court asks " 'whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. . . . [¶] . . .' [Citation.]"  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

In rendering its decision, the trial court applied this standard, finding "beyond a reasonable doubt that there was sufficient evidence presented to show" that Duke acted with the intent to kill.  Under any standard of review, that decision was correct.  Duke was a gang member and viewed Enriquez as a snitch, giving him a motive to kill Enriquez.  Palmer testified that Duke urged him to kill Enriquez and offered to provide a gun.  Tatum told police that he saw Duke and Crowder carrying large knives as they went to confront Enriquez.  Thomas told police that Duke stood nearby while Crowder stabbed Enriquez, not merely acting as lookout but ready to assist if Crowder needed help.  And Duke did nothing to attempt to restrain Crowder even as he stabbed Enriquez 15 times.  A reasonable

---

murder."  These requirements can be determined simply by examining the charging document and the record of the defendant's conviction.  In this case, no one denies that Duke meets both requirements.  (§ 1170.95, subd. (a)(1) & (2).)

jury could conclude beyond a reasonable doubt on the basis of this evidence that Duke acted with express malice, directly aiding and abetting the murder.  Thus, although the trial court erred by examining the case as if it involved felony murder, it correctly denied Duke's petition for resentencing.

## DISPOSITION

The trial court's order is affirmed.

CERTIFIED FOR PUBLICATION.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


SINANIAN, J.*

---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15